IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WHITEHALL FARM, LLC | : | |
| | : | **Civil Action No.** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| THE HANOVER INSURANCE GROUP | : | |
| | : | |
| Defendant. | : | |
| | : | |

## COMPLAINT

Plaintiff Whitehall Farm, LLC ("Plaintiff" or "Insured") files this Complaint against Defendant The Hanover Insurance Group ("Hanover") because of Hanover's refusal to provide coverage for losses plainly covered by Insured's builders' risk policy and failure to communicate with Insured concerning that decision, averring:

## PARTIES

1. The Insured is a Pennsylvania limited liability company, with a registered address of 1835 Market St., Ste. 1400, Philadelphia, PA 19103.

2. Insured, through its members, is a citizen of Vermont.

3. Hanover is a New Hampshire domestic insurance company with a principal place of business located at 440 Lincoln Street, Worcester, MA 01653.

4. Upon information and belief, Hanover is a citizen of New Hampshire and/or Massachusetts.

## JURISDICTION AND VENUE

5. Jurisdiction is proper under 28 U.S.C. 1332 (a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

6. Venue is proper under 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to this litigation occurred in this judicial district and the property that is the subject of this claim is located within the Eastern District of Pennsylvania.

## FACTS

### A. The Project

7. This claim arises out of losses resulting from the systemic and pervasive defective construction performed by a subcontractor, Advanced Flooring & Tile, LLC ("Subcontractor") at 16 Street Rd., New Hope, PA 18938 (the "Property"), resulting in significant damage to property owned by the Insured, and from Hanover's subsequent failure to provide coverage to Insured as required under the applicable builders' risk policy.

8. The Property has multiple buildings, including a new construction, two-story single-family dwelling of about 6,550 square feet (the "Main House") and an existing stone guest house (the "Stone House") of about 1,950 square feet that was built in the mid-to-late 18th century.

9. Insured is the owner of the Property and is the named insured under a builders' risk policy, issued by Hanover and numbered IHY J925229[1] (the "Policy"), which covers the Main House. A copy of the Policy is attached hereto as Exhibit 1.

10. Insured is in the business of building and/or renovating luxury houses, incorporating bespoke high-end elements and materials throughout the homes to appeal to an extremely discerning clientele Many of these materials are custom made and built to order, with significant lead times required for their development.

---

[1] A separate Hanover policy, IHY-J922407, covers a garage being built on the Property.

11. Insured engaged general contractor Alpha Genesis Design Build, LLC d/b/a Pastella Burns ("Pastella" or "Contractor") to construct the Main House in its entirety and to fully renovate the Stone House (the "Project").

12. Pastella's performance on the Project met or exceeded every contractual obligation.

**B.   The Subcontract Agreements**

13. To complete the Project, Pastella selected Subcontractor to install basalt floor tile and shower systems throughout both the Main House and the Stone House, including tile in all bathrooms, a wet room, and a sauna at the Property.

14. Subcontractor affirmatively held itself out as qualified to perform this specialty work—which, as the facts show, was a gross misrepresentation, resulting in significant damage to Insured's property covered under the Policy.

15. On or about May 1, 2025, Pastella and Subcontractor entered into a subcontract (the "Stone House Subcontract"), which required Subcontractor to provide labor and materials in connection with the installation of tiles owned by the Insured and bathroom construction in the Stone House. The Stone House Subcontract is attached hereto as Exhibit 2.

16. On or about July 24, 2025, Pastella and Subcontractor entered into a second agreement (the "Main House Subcontract" and, with the Stone House Subcontract, the "Subcontract Agreements"), which, similar to the Stone House Subcontract, required Subcontractor to provide labor and materials in connection with the installation of tiles owned by the Insured and bathroom construction at the Main House. The Main House Subcontract is attached hereto as Exhibit 3.

17. The Subcontract Agreements provided that, *inter alia*, Subcontractor was to:

(a) Supply material and labor to install 2'x4' basalt tiles throughout the buildings, including basement, first floor, and second floor;

(b) Install Schulter shower walls, pans, and drain systems and all shower wall tiles in bathrooms;

(c) Supply sealant and apply sealant on all tiles prior to and after grouting;

(d) Supply all thin set, grout, and sealant; and

(e) Clean all tile surfaces at completion of the work such that there is no grout film left on the tile surfaces.

Exs. 2, 3, Subcontract Agreements at ¶ 2.

18. The Subcontract Agreements specifically required installation of the complete Schulter shower system, including shower pan, shower wall, shower drain, because it is of high quality and waterproof.

19. Subcontractor was expressly obligated to follow all manufacturer specifications, industry standards, and Pastella directives—none of which occurred.

20. The requirements of the Subcontract Agreements are explicit and unambiguous, yet Subcontractor ignored them in practice, resulting in significant damage to Insured's covered property.

C. **Subcontractor's Defective Work**

21. Subcontractor's work fell so far below the required standards that entire systems must now be demolished and rebuilt.

22. On or around October 10, 2025, Insured discovered that many tiles throughout the Stone House and Main House were damaged from deficient work by Subcontractor.

2. Additionally, the corners of the tiles shift up and down under foot traffic. This is not a minor deviation. Rather, it is the result of a failure of the tile to properly bond to the substrate due to Subcontractor's installation failures.

23. These failures are catastrophic, systemic, and affect tiles in almost every room of both houses.

24. These tiles were installed on top of "Levelrock," which is a gypsum-based self-leveling underlayment with specific installation requirements for basalt tiles.

25. The Levelrock manufacturer's specifications require that the Levelrock surface be primed prior to installing tiles with thinset mortar, and that the thinset mortar used be compatible with Levelrock.

26. Subcontractor ignored both requirements, guaranteeing installation failure.

27. As a result of Subcontractor's failure to properly install the tiles, they did not bond to the subfloor and are coming loose, necessitating that all tiles be removed and replaced. This further damaged the tiles as well as portions of the subflooring.

28. Additionally, following installation, Subcontractor improperly and recklessly cleaned the tile with an acidic cleaner.

29. Acid is known to damage igneous stone, such as the basalt tile used in the Project.

30. As a result of the use of acidic cleaner, the tiles were damaged and now have an etched surface, which look permanently cloudy, discolored and dirty.

31. Subcontractor's deficient work resulted in irreparable damage to the tile owned by Insured, requiring it to be replaced at significant expense.

32. Moreover, in replacing the tile, Pastella will have to remove extensive custom-built woodwork already incorporated into the Project, including wall panels, built-ins, thresholds, and integrated finishes.

33. This process will likely destroy the wood, requiring replacements to be ordered and installed.

34. The damage resulting from Subcontractor's failures does not relate only to the tile installation.

35. Although the Subcontract Agreements require that Subcontractor purchase and install a complete Schulter system in the showers, wet room, and sauna, Exs. 2,3 at 1, inexplicably, Subcontractor only used the Schulter system on the shower pan and not on the shower walls.

36. Subcontractor also failed to properly waterproof the walls or the joints where the floor and walls meet.

37. These defects pose ongoing water-intrusion risk, rendering the installations unusable and unsafe.

### D. Damages

38. To address the damage resulting from Subcontractor's defective work, Insured has been forced to replace, remove, and reinstall all tiles, none of which are salvageable, and replace the shower systems with the correct system that is properly waterproofed.

39. This ensuing loss includes damage to the Property, its shower systems, and more than 44 tons of tile and other material owned by the Insured.

40. Since the Project was nearly complete when Insured discovered these problems, accessing the tile and shower systems for remediation requires removing custom-fabricated, high-value materials, many of which cannot be removed intact and will be unavoidably damaged. Thus, Subcontractor's failures now force the destruction and replication of bespoke elements.

41. Additionally, to properly remedy the damage resulting from Subcontractor's defective work, Insured will have to:

    (a) order approximately 44 tons of all new custom basalt tiles;

    (b) remove and replace extensive custom-ordered woodwork;

    (c) contract with the Levelrock installer to inspect for substrate damage and replace as needed;

    (d) engage a contractor for HVAC remediation;

    (e) order new protective floor coverings; and

   (f) repoint stone walls.

  42. With respect to the Main House, which is the subject of Insured's claim and this litigation, Insured estimates that damages to Insured's property resulting from Subcontractor's deficient work total more than $1.4 million. This is a conservative figure that does not account for consequential and delay damages that continue to accrue due to Subcontractor's actions. This figure also does not include the cost of redoing Subcontractor's work and installing replacement tiles.

  **E.** **HANOVER'S DENIAL OF COVERAGE**

  43. Because of the significant losses to Insured's property resulting from Subcontractor's defective work, on or about October 10, 2025, Insured, through its broker, submitted Claim No. 85-00861610 (the "Claim") to Hanover seeking coverage under the Policy for the damage to the Main House.

  44. On or about October 24, 2025, a representative of Hanover visited the Property to inspect the damage resulting from Subcontractor's work.

  45. On November 18, 2025, Hanover issued a letter denying coverage, purportedly based on an exclusion relating to coverage for defective work. A true and correct copy of Hanover's denial letter is attached hereto as <u>Exhibit 4</u>.

  46. Specifically, Hanover's letter stated, "this policy does not provide coverage for losses which are a result of improper construction, workmanship or materials used in the construction," and that "[s]ince no ensuing damage occurred, there is no coverage that is available for your loss." *Id.*

  47. Hanover's denial is improper and is contradicted by the plain language of the Policy, Hanover's own forensic findings, and Pennsylvania law.

48. As described above and contrary to Hanover's assessment, significant ensuing damage occurred, causing more than $1.4 million in damage to bespoke materials owned by Insured at the Main House.

49. The tiles, custom woodwork, substrate, and other materials that are the subject of the Claim are Covered Property under the Policy. Specifically, the Policy states that "Covered Property" includes "[c]onstruction materials and supplies that will become a permanent part of the completed 'buildings or structures' while located at the described construction site." *See* Exhibit 1 at Builders' Risk Coverage Form sec. A.1.b. All of the damaged materials were intended to become a permanent part of the completed buildings.

50. Further, the tiles and substrate were provided by the Insured and its general contractor, and as such could not be included in any part of Subcontractor's work.

51. The Policy explicitly states that if an excluded loss "results in a Covered Cause of Loss, [Hanover] will pay for the 'loss' caused by or resulting from that Covered Cause of Loss." *See* Exhibit 1 at Builders' Risk Coverage Form sec. B(3)(d).

52. Thus, the Policy provides coverage for all losses resulting from defective work other than the cost of performing corrective work. *See, e.g., Griggs Road LP v. Selective Way Insurance Company of America,* 368 F. Supp. 3d 799, 810 (M.D. Pa. 2019) (analyzing nearly identical policy language and holding that losses alleged were covered by the policy).

53. According to Hanover's denial, its own expert, Envista Forensics ("Envista") documented acid etching, surface discoloration, debonding of tiles, differential staining patterns indicating chemical misuse, and substrate compromise, confirming unambiguously that Insured's covered property sustained direct physical damage that resulted from the Subcontractor's actions.

54. To be clear, Insured does not seek coverage for the cost of redoing Subcontractor's work in a proper manner. It seeks coverage for all of the other losses resulting from Subcontractor's failures.

55. Despite the materials being covered under the Policy, Hanover denied coverage for direct physical loss to Covered Property—a position that renders the coverage illusory. If Covered Property damaged by a subcontractor's improper methods is never covered, then Hanover's builder's risk policy provides no meaningful protection at all.

56. Because Insured's significant losses are covered by the Policy, on December 8, 2025, Insured responded to Hanover's denial, demanding that it reverse its prior decision and provide coverage. A copy of Insured's response is attached hereto as <u>Exhibit 5.</u>

57. On January 15, 2026, Insured's counsel followed up on that correspondence to inquire as to whether Hanover had re-evaluated its position.

58. To date, Insured has not received any response from Hanover to either of these efforts to resolve this matter.

## **COUNT I – BREACH OF CONTRACT**

59. The preceding paragraphs are incorporated by reference.

60. The Policy is a valid and enforceable contract between Hanover and its Insured.

61. The Policy provides coverage for the losses claimed by Insured.

62. Hanover breached the Policy by denying the Claim.

63. As a result, Insured has suffered damages of at least $1,465,525.00 as it has had to replace a significant amount of costly materials that were damaged as a result of Subcontractor's work.

**WHEREFORE**, Insured requests judgment awarding damages in an amount to be determined at trial and in excess of $75,000.00 and such other and further relief as the Court deems just and proper.

## COUNT II – DECLARATORY JUDGMENT

64. The preceding paragraphs are incorporated by reference.

65. For the reasons set forth above, an actual, justiciable controversy exists between Insured and Hanover concerning the coverage owed by Hanover to Insured regarding the significant damage to Insured's Covered Property that was caused by and resulted from Subcontractor's defective work.

66. As set forth above, Hanover has denied any coverage for Insured's claim and has refused to reconsider this position or even engage in communication with Insured concerning its decision.

67. Pursuant to 28 U.S.C. § 2201, Insured is entitled to a judicial determination concerning the scope and nature of its rights under the Policy with respect to the Claim.

68. Specifically, Insured seeks a determination that the losses that are the subject of the Claim are covered losses under the Policy and that no exclusion applies to remove coverage.

**WHEREFORE**, Insured respectfully requests a declaratory judgment in its favor and against Hanover finding that Hanover has an obligation under the Policy to provide coverage to the Insured for the losses described herein together with an award of attorney's fees and such other relief as the Court deems just and appropriate.

## COUNT III – BAD FAITH

69. The preceding paragraphs are incorporated by reference.

70. Hanover acted in bad faith by denying the Claim on the ground that the losses were excluded were the result of improper construction, workmanship, or materials used in the construction and finding that no ensuing damage occurred.

71. Hanover has no reasonable basis to deny the Claim, which, as set forth above, is for covered ensuing damage.

72. Hanover knew or recklessly disregarded its lack of reasonable basis in denying the Claim.

73. Hanover acted in bad faith in refusing to reevaluate the Claim following Insured's demand and in refusing to communicate further with Insured concerning its coverage decision.

74. Hanover lacked a reasonable basis for any of the foregoing conduct and it knew or recklessly disregarded its lack of reasonable basis, and engaged in said conduct to the great detriment and loss to its Insured.

75. As a result of Hanover's willful, wanton, reckless, improper, and bad faith conduct, Insured suffered damages in excess of $1,465,525.00.

76. Due to its bad faith conduct, Hanover is liable for treble damages, punitive damages and/or attorney's fees and costs of suit.

**WHEREFORE**, Insured requests judgment awarding damages in an amount to be determined at trial and in excess of $75,000.00 together with interest, treble damages, punitive damages, attorney's fees, costs of suit and such other and further relief as the Court deems just and proper.

Insured demands a jury on all claims so triable.

Dated: March 5, 2026

KLEHR HARRISON HARVEY BRANZBURG LLP

By: */s/ Monica Clarke Platt*
Grant Phelan (Pa. ID 65741)
Monica Clarke Platt (Pa. ID 311445)
Stephen J. Martin (Pa. ID 330614)
1835 Market Street, Ste. 1400
Philadelphia, PA 19103
(215) 569-2096
*Attorneys for Whitehall Farm, LLC*